## PEOPLE v. WALLACH.

*(Supreme Court, General Term, First Department. June 26, 1891.)*

DISORDERLY HOUSE—KNOWLEDGE OF OWNER—EVIDENCE.

On an indictment for permitting premises owned by defendant to be occupied as a house of prostitution, (Pen. Code N. Y. § 322,) it appeared that the tenant had been indicted for keeping such a place on the premises in question, and that defendant was present in the police court when the tenant was arraigned. It also appeared that defendant had been notified by officers of the Society for the Prevention of Cruelty to Children of the character of the tenant, and of the fact that she kept a disorderly house, to which defendant replied that he did not see that it was any of his (defendant's) business, that one tenant was as good as another to him so long as the rent was paid, and that he would rent to anybody. *Held,* that the evidence was sufficient to charge defendant with knowledge of the use to which the premises were put.

Appeal from court of general sessions, New York county.

Sampson Wallach was indicted for knowingly permitting premises owned by him to be occupied as a house of ill fame, and from a judgment of the general sessions affirming a judgment of conviction by the special sessions defendant appeals.

Argued before VAN BRUNT, P. J., and BARRETT and PATTERSON, JJ.

*Philip Carpenter* and *Charles A. Hess,* for appellant. *De Lancey Nicoll,* Dist. Atty., (*David Welch,* Asst. Dist. Atty., of counsel,) for the People.

BARRETT, J. The defendant was tried in the court of special sessions for the misdemeanor of permitting certain premises in this city, of which he was the owner, to be kept, maintained, and occupied as a house of prostitution, in violation of section 322 of the Penal Code. The fact that the defendant was the owner of these premises, and that they were so kept, was abundantly established, and the only question in the case is as to the defendant's guilty knowledge. That such guilty knowledge must be shown is undoubtedly the law. It may, however, like any other fact, be shown by circumstantial evidence. We have carefully considered the testimony on that head, and our conclusion is that this crucial fact was sufficiently established. The premises in question were occupied by several families, it being a tenement-house, and the complaint was directed against the first flat on the lower floor. It appears that as far back as March, 1890, this lower flat was occupied as a place of prostitution, and the defendant's tenant, one Annie Winniss, was, in that month, tried for keeping the place and convicted. Pending these proceedings, the defendant was notified by an officer attached to the Society for the Prevention of Cruelty to Children (one Wilson) of the character of the tenant, and of the fact that she kept a disorderly house; also of the fact that his own housekeeper at the premises was an immoral woman, and had herself solicited the officer. The defendant was also present when the woman Winniss was arraigned in the police court, and was there spoken to by another officer of the society, (one Becker,) who told him that he (Wallach) should get rid of such people as Annie Winniss. When notified by Officer Wilson of the character of his tenant, the defendant declared that it was none of his (Wallach's) business; that one tenant was as good to him as another, so long as the rent was paid; and that he could not see that it was his business, "in any shape or form, to inquire whether people had any certificate of marriage or not." This was the spirit in which he received this officer's notice, followed, as it was, by a respectful suggestion that the defendant was "under some obligation to the children of the neighborhood." Within a month after the conviction of Annie Winniss, the same premises were again rented to the keeper of a brothel, one Jennie Hart, and she occupied them, plying her trade with impunity, until the following November, when she also was arrested, tried, and convicted for keeping a disorderly house. The place was of the

lowest character, and the women seem from the testimony to have been unusually depraved. The same housekeeper against whom the defendant was warned in the preceding March was retained. She sometimes collected the rents. At other times the defendant collected them. He went to the house on the 2d or 3d of every month, and his rent, he says, was "always there when he came." He acknowledged to an officer attached to the society already referred to, named Finn, that he had personally collected the rent from Jennie Hart for the last two months prior to the arrest in November, and he must indeed have been blind if on these occasions he observed no evidences of prostitution. In the same connection he declared that he would rent his premises to prostitutes, or to any one; that it was his business, and no one else's, to whom he rented them; and again, when his attention was called by this officer to the fact that it was the second time that these premises had been "raided" as a house of prostitution, he replied: "What is that your damned business? I will let my rooms out to any Tom, Dick, or Harry." This testimony was corroborated by Officer Moore, who testified that the defendant said, when informed that it was a second offense, that he did not care. He would rent his rooms to whom he chose, if he got better rent. The enormity of all this is emphasized by the fact the other tenants were respectable people, with young children, one of whom this Jennie Hart used to encourage to come to her rooms. Even after Jennie Hart was convicted the defendant was apathetic about removing her, and she still continued for some two weeks to occupy the floor in question. The defendant explained that this delay was because of his illness; but it is quite significant that the city marshal, (Mulvahill,) in answer to Mr. Jenkins, who represented the society, finally declared that the proceeding to dispossess Jennie Hart was commenced on the 8th of December, which was the very day when the defendant was indicted. We think, upon all this testimony, that the court below was entirely justified in finding guilty knowledge with regard to Jennie Hart, and to the place which she kept. The conduct and the declarations of the defendant throughout were entirely inconsistent with innocence. They plainly indicated guilt, and defiant guilt at that. There is nothing in any legal question presented, and the judgment should therefore be affirmed. All concur.