(92 Misc. Rep. 62)

### PEOPLE v. RANKIN.

(Court of General Sessions of the Peace, New York County. October 6, 1915.)

1. VAGRANCY ⚖➝1—NATURE OF OFFENSES—KNOWLEDGE AND INTENT.

    Code Cr. Proc. § 899, subd. 4, providing that keepers of houses for the resort of prostitutes, drunkards, tipplers, gamesters, habitual criminals, or other disorderly persons shall be considered disorderly persons, prohibits a course of conduct on the part of the person accused, and the acts prohibited must be shown to have been committed with the knowledge of defendant before a conviction can be sustained.

    [Ed. Note.—For other cases, see Vagrancy, Cent. Dig. § 1; Dec. Dig. ⚖➝1.]

2. VAGRANCY ⚖➝3—KNOWLEDGE AND INTENT—EVIDENCE.

    In a prosecution under Code Cr. Proc. § 899, subd. 4, providing that keepers of houses for the resort of prostitutes, drunkards, tipplers, gamesters, habitual criminals, or other disorderly persons shall be considered disorderly persons, evidence *held* not sufficient to show that defendant knowingly allowed prostitutes to resort to his premises.

    [Ed. Note.—For other cases, see Vagrancy, Cent. Dig. § 3; Dec. Dig. ⚖➝3.]

John Rankin was convicted of being a disorderly person, and he appeals. Reversed.

Olcott, Gruber, Bonynge & McManus, of New York City, for appellant.

Charles Albert Perkins, Dist. Atty., of New York City, for the People.

WADHAMS, J. This is an appeal from a judgment of the City Magistrate's Court finding the defendant guilty of being a disorderly

---

⚖➝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

person in violation of subdivision 4 of section 899 of the Code of Criminal Procedure, which reads as follows:

"The following are disorderly persons: * * * (4) Keepers of bawdy-houses or houses for the resort of prostitutes, drunkards, tipplers, gamesters, habitual criminals, or other disorderly persons."

[1] This appeal presents the question whether guilty knowledge is an essential element of the offense of being a disorderly person, of which the defendant has been convicted, and, if it is, whether the evidence establishes such knowledge. The defendant is the proprietor of a hotel. Certain police detectives testified that they had this hotel under observation, that certain prostitutes were seen entering the premises, and that on two nights, acting under instructions of their superior officer, they permitted themselves to be solicited on the street and were escorted by women to the premises for immoral purposes.

The defendant was not present, and it is contended in support of the conviction that, whether or not he had knowledge of the presence in his hotel of prostitutes, the evidence established that they had gone to the hotel for immoral purposes, and that, therefore, the hotel being shown to be a resort for prostitutes, that alone is sufficient to establish the defendant's guilt as a disorderly person. If this be the law, it matters not whether the defendant countenanced or knew such fact, or even whether he had, by his instructions, prohibited it and taken reasonable steps to prevent it. The learned magistrate stated in rendering his judgment that it was "one of the risks of the hotel business."

In support of the conviction, it is contended that the acts are prohibited, and that the case falls within the class of cases in which the defendant is held liable if the prohibited acts occur. Illustrations of this rule are found in the milk cases, in which the statute prohibits the sale of unclean or adulterated milk (People v. Bowen, 182 N. Y. 1, 74 N. E. 489; People v. Kibler, 106 N. Y. 321, 12 N. E. 795; People v. West, 106 N. Y. 293, 12 N. E. 610, 60 Am. Rep. 452; People v. Cipperly, 101 N. Y. 634, 4 N. E. 107), and in the liquor tax cases, in which the statute prohibits the sale of liquor to minors (People v. Werner, 174 N. Y. 133, 66 N. E. 667), or the screening of windows (People v. D'Antonio, 150 App. Div. 109, 134 N. Y. Supp. 657).

In the case of People v. Werner, supra, the court, at page 134 of 174 N. Y., at page 667 of 66 N. E., says, with respect to criminal intent:

"The law on that subject seems to be that an act malum prohibitum is not excused by ignorance, or a mistake of fact when a specific act is made by law indictable, irrespective of the defendant's motive or intent. * * * The general rule that the criminal intention is the essence of the crime does not apply to such prohibited acts."

In People v. D'Antonio, supra, the court says, at page 113 of 150 App. Div., at page 660 of 134 N. Y. Supp.:

"Statutes which are in their nature police regulations, as the one here under consideration is, impose criminal penalties, irrespective of any intent

and obviously for the purpose of requiring a degree of diligence for the protection of the public against violations. This statute forbids one holding a liquor tax certificate similar to the one held by the defendant to do, or permit to be done, certain prohibited acts, and by fair intendment this includes acts done in the use of the premises in carrying on the business, whether done by the licensee in person or by his agent left by him in charge and management of the business during his absence."

In the recent case of Tenement House Department v. McDevitt, 215 N. Y. 160, at page 167, 109 N. E. 88, at page 89, in construing section 109 of the Tenement House Law (Consol. Laws, c. 61, as amended by Laws 1913, c. 598), which provides, "No tenement house shall be used for the purpose of prostitution or assignation of any description," and section 124, which provides that the owner of the tenement house where a violation of this chapter or nuisance exists shall be subject to a civil penalty of $50, Judge Cardozo, in delivering the opinion for the court, says:

"The statute does not make his liability dependent upon knowledge or even upon negligence. It makes his liability dependent upon the prohibited use."

And, after reviewing the authorities, at page 170 of 215 N. Y., at page 91 of 109 N. E., he says:

"In all these cases the statutes construed were made in the exercise of the police power, and in all the evil was repressed by penalties that took no heed of the state of mind of the offender."

This is not a prosecution for a penalty under the Tenement House Law; but the defendant is prosecuted for a violation of section 899 of the Code of Criminal Procedure, charging him with being a disorderly person. Under the Tenement House Law, it is the "use," or the condition which is likened to the existence of a nuisance, which is prohibited, and the penalty imposed is a fine. Under section 899 of the Code of Criminal Procedure it is conduct personal to the defendant which constitutes the offense. In Tenement House Department v. McDevitt, Judge Cardozo at page 167 of 215 N. Y., at page 90 of 109 N. E., says:

"We do not need to determine now the limits within which criminal liability in the strict sense may attach to one as the result of the misconduct of another, to the master as the result of the misconduct of the servant, to the landlord as the result of the misconduct of the tenant. The owner under this statute is not charged with any crime. He is made subject to a penalty, but the recovery is through a civil action, and not through criminal prosecution."

In People v. Cullen, 153 N. Y. 629, at page 635, 47 N. E. 894, at page 895 (44 L. R. A. 420) Judge O'Brien, in construing section 899 of the Code of Criminal Procedure, said, in reversing a judgment in which the defendant had been convicted of being a disorderly person, in that he had abandoned his wife without adequate support:

"The charge of which the defendant was convicted, if not a crime within the meaning of the Penal Code, was clearly of a criminal nature, and it was incumbent upon the people to prove it. The statute is summary, highly penal and should be strictly construed."

Under section 899, upon conviction the defendant may be required to give an undertaking for good behavior, and if he fails to do so is subject to imprisonment in a penitentiary for a period not exceeding six months. Code of Criminal Procedure, §§ 901, 902, 903.

Although, as was pointed out in the McDevitt Case, the law is not oblivious of considerations of degree and the nature and extent of the penalty attached to the offense in determining the constitutionality of an act, in my opinion such consideration is not conclusive upon the question of whether knowledge or intent are or are not elements of the offense.

There are many illustrations of crimes in which the guilty act alone constitutes the offense, and these are not confined to offenses in which monetary penalties only are imposed, but include cases in which imprisonment may follow conviction. The test is rather whether the Legislature, in the exercise of a valid police power, has prohibited certain acts and placed the liability upon certain persons for the occurrence of such acts, or whether the statute prohibits a course of conduct, and places the liability upon all persons who undertake such course of conduct. In the first class, knowledge or intent is not an essential element; whereas, in the second class, it is. In People v. D'Antonio, 150 App. Div. 109, at page 111, 134 N. Y. Supp. 657, at page 659, Mr. Justice McLaughlin says:

"There is a well-recognized distinction between acts mala in se and mala prohibita. Under the latter it is well settled that criminal intent forms no part or element of the offense."

In my opinion, section 899 prohibits a course of conduct on the part of the defendant, and the acts must be shown to have been committed with the knowledge of the defendant before a conviction can be sustained. The Court of Appeals in the McDevitt Case draws a distinction between section 109 of the Tenement House Law, in which the act is prohibited, regardless of the owner's knowledge of the offense, and section 150, which describes a vagrant as a person who keeps or maintains a house of prostitution. The language in section 899 of the Code of Criminal Procedure describing a disorderly person is almost identical with that describing a vagrant under section 150 of the Tenement House Law.

The keeping of a common bawdy or gambling house was a nuisance at common law, and indictable as a misdemeanor, and guilty knowledge of the acts committed therein on the part of the defendant was a necessary element of the crime. King v. People, 83 N. Y. 587; Lowenstein v. People, 54 Barb. 299. The misdemeanor was defined by statutory enactment in section 322 of the Penal Code, and is found in the present Penal Law in section 1146. Section 1146 provides, "Whosoever shall keep or maintain a house of ill fame * * * shall be guilty of a misdemeanor;" and section 322 provides, "A person who keeps a house of ill fame * * * is guilty of a misdemeanor." It has been held under these statutes that guilty knowledge is an essential element of the crime. People v. Drum, 127 App. Div. 241, 110 N. Y. Supp. 1096; People v. Wallach, 60 Hun, 584, 15 N. Y.

Supp. 226; People v. Miller, 81 App. Div. 255, 80 N. Y. Supp. 1070. And see People v. Warden of the City Prison, 154 App. Div. 256, 138 N. Y. Supp. 1073.

I have been unable to find any case construing the language of subdivision 4 of section 899 of the Code of Criminal Procedure, which is derived from 1 R. S. 638 (volume 3, page 1947, 7th Ed.), defining a disorderly person as "the keeper of a bawdyhouse or house for the resort of prostitutes"; but the terms used in the statutes already construed are so similar that they must be deemed the controlling authorities. Although the Legislature by appropriate enactment may prohibit the admission of dissolute characters to a hotel, and provide that the proprietor of any hotel where such person has entered shall be guilty, it is sufficient to observe that in the definition of the offense with which this defendant is charged the Legislature has not done so. The prosecution must therefore show that the defendant had guilty knowledge. Such knowledge, however, need not be established by direct evidence, but may be proven by circumstances from which knowledge may be inferred. In People v. Wallach, supra, Judge Barrett (Van Brunt, P. J., and Patterson, J., concurring) 60 Hun, 584, 15 N. Y. Supp. at page 226, says:

"That such guilty knowledge must be shown is undoubtedly the law. It may, however, like any other fact, be shown by circumstantial evidence."

In the cases of People v. Finucan, 80 App. Div. 407, 80 N. Y. Supp. 929, and Matter of Clement (Ruehl Certificate) 144 App. Div. 156, 128 N. Y. Supp. 882, cited in support of the judgment, the guilty knowledge of the defendants was clearly proven. In the Finucan Case, a judgment was affirmed which convicted the defendant of the crime of unlawfully instigating, aiding, and encouraging a prize fight, in violation of section 458 of the Penal Code. After summarizing the evidence, the court in part says:

"When it is remembered that the evidence showed that the greater part of the crowd were present in his (defendant's) barroom before the contest, that the tickets were on sale there, or were handed around in his presence, the evidence points unmistakably to the conclusion that the defendant either knew of the real purpose or took such pains not to know as amounts to the same thing. The defendant could not close his eyes to matters which were passing about him, and allow his premises to be used in violation of law, and escape responsibility."

In the Clement Case the proceeding was instituted by the state commissioner of excise to revoke a liquor tax certificate upon the ground that the respondent had permitted the premises designated in the certificate "to become, be and remain disorderly." The court at page 157 of 144 App. Div., at page 883 of 128 N. Y. Supp., said:

"The evidence is of such a character that decency forbids any attempt even to summarize it. It is sufficient to say that it shows that the premises, which were under the management of an ex-prize fighter, were the resort of professed prostitutes, who plied their arts of invitation and seduction in the frankest and most disgusting manner under the very eyes of the employés of the place, who made no attempt to interpose restraint or reproof. A portion of the premises was filled up with partly inclosed booths or cubicles, well

designed to lend themselves to the disorderly practices of the habitués of the place, and which were apparently freely used for such purposes.    *    *    * If the latter [manager and his employés] did not see, it could only have been because they would not."

The authorities already cited indicate that the guilt of the defendant depends upon his personal conduct as keeper; that to constitute guilt there must be a keeping with knowledge.    The term "personal conduct," however, does not necessarily mean actual participation, but includes toleration, license, and permission, and the knowledge which must be established may be shown inferentially.    The inquiry must be, not only whether the defendant had actual knowledge, but whether under the conditions as they existed it does not follow that he intentially refused to observe, that he was purposely blind, and that he intentionally failed to take steps appropriate to correct the existing conditions, so that as a conclusion of fact it must be inferred that the defendant did have a guilty knowledge.    What was the bona fide intention of the defendant in the maintenance of the premises?    Did he attempt to avoid liability for his misconduct by a show of respectability?    Was he, in verity, a disorderly person, in that he kept a house for the resort of prostitutes?    In determining these questions, the court may properly take into consideration:    First, the proof of the acts which actually occurred;    second, the character of the premises;    and, third, the acts of the defendant and his employés.

It does not appear that there had been any complaint by any guest or person residing in the neighborhood.    The information was lodged by police officers, who were called as witnesses and testified that they had received instructions from their superior officer "to get" the hotel, and that the acts concerning which they testified were performed pursuant to such instruction.    The evidence produced by the prosecution consisted entirely of the testimony of these police officers, and may for convenience be divided into two parts.    The first part consisted of observation of the hotel from the outside, covering a period of about 20 days, and was to the effect that during that time a number of women, characterized by the officers as prostitutes or night-walkers, had entered the premises accompanied by men;    that some of them were seen to come out;    that others remained for different periods of time.    The officers, refreshing their recollection from notebooks, without which, they stated generally, they were unable to identify the women, testified as to some of them that they had been previously convicted of soliciting.    None of these women was followed into the premises;    the testimony being that they were seen to enter at the door of the hotel and walk along the lobby.    The second part of the police evidence consisted in the testimony of detectives, who stated that upon two consecutive nights they had gone to the premises with women, by whom they said they had been solicited, had registered as man and wife, had been shown to rooms, where they remained for a brief period of time and then left, having first paid the women the price asked;    that in certain instances the same officer returned with a different woman, and in other instances the same woman returned with a different detective on the same night.

The employés described by the officers as present on these nights were the night clerk behind the desk, the elevator man, and the bell boy, who showed them to the rooms. The defendant was not present, and there was no evidence that he knew of the visits of the detectives with these women. The evidence shows that the house in question is a hotel at Nos. 123–129 West Forty-Fourth street, being a 13-story building, containing 250 rooms, which cost some $650,000 to build, and that it was being operated by the defendant for the accommodation of permanent and transient guests.

A hotel, no matter how large, costly, or elegant its furnishings, may be a bawdyhouse, or house for the resort of prostitutes, and kept as such by the proprietor, in whole or in part; but in determining the guilt of a defendant charged with being a disorderly person the fact that the premises are actually maintained as a hotel, and the legal obligations of the defendant in maintaining them as such, may be an important consideration. By Penal Law, § 513, it is provided:

"A person, who * * * carries on business as innkeeper, or as common carrier of passengers, and refuses, without just cause or excuse, to receive and entertain any guest, or to receive and carry any passenger, is guilty of a misdemeanor."

Such refusal is also an indictable offense at common law. Cornell v. Huber, 102 App. Div. 293, 92 N. Y. Supp. 434. And by section 40 of the Civil Rights Law (chapter 14, Laws of 1909; chapter 6, art. 4, of the Consolidated Laws), it is provided:

"All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels. * * *"

And by section 41 a person who violates the provisions of this section is subject to a penalty to be recovered in any court of competent jurisdiction in the county where the offense was committed, and is also to be deemed guilty of a misdemeanor, and upon conviction therefor to be fined not less than $100 nor more than $500, or imprisoned not less than 30 days nor more than 90 days, or both.

As was said in People v. Drum, 127 App. Div. 241, 110 N. Y. Supp. 1096:

"Evidence that would suffice to show that a private house was a house of assignation might entirely fail to prove that of a licensed inn or hotel, which is the case with the evidence here."

[2] That the defendant was actually maintaining a hotel was established by the evidence. About one-third of the guests were transients and two-thirds permanent; some of the permanent guests having been resident in the hotel for over 10 years. There were families residing on all floors, and no part of the house was specifically set aside for transient guests. Among the permanent guests of the hotel was a well-known writer and lecturer, a musical director and his wife and 16 year old daughter, a dramatic critic for one of the leading New York daily newspapers, who had resided in the hotel for 9 years, an operatic critic, also the widows of two commanders in the United

States Navy, and several elderly ladies. As the premises are situated in the heart of the theater district and near a large newspaper center, there is frequent coming and going in the late hours of the night by persons residing or stopping at the hotel and who are engaged in business in the neighborhood.

Many of the guests were called as witnesses and testified that the premises had been conducted as an orderly hotel. The evidence showed that the defendant lived in the hotel with his wife and his three children, who were born on the premises, and that he had been conducting the hotel for 11 years under a lease from his father, who is the owner. There are parlors, a lobby, and a restaurant on the ground floor, and it appears from the evidence that at times 8,000 people came into the hotel in a month. There is no evidence as to conduct of an improper or disorderly nature by the persons whom the police state they recognized as undesirable characters and whom they saw entering when they had the hotel under observation. In view of the public character of the premises, even assuming that undesirable persons had entered, this evidence alone was clearly insufficient to establish that the defendant was a disorderly person. Similar evidence was held insufficient in the case of People v. Miller, 81 App. Div. 255, 80 N. Y. Supp. 1070. It may be noticed that the registers of the hotel, covering the period when it was under observation by the police, which were offered in evidence, failed to support any inference of improper conduct on the part of these visitors.

The second part of the evidence produced by the police, namely, that relating to their escorting women to the premises, their false representations to the hotel clerk, their accompanying the women to assigned rooms, and their payment of the city's money therefor to the women, the defendant contends should be rejected by the court upon the ground that it is manufactured evidence. On the other hand, this evidence is justified by the prosecution upon the ground that it is necessary in order to obtain evidence against a house kept as a resort for prostitutes. It must be conceded that the problem of suppressing houses which are maintained for the resort of prostitutes or other disorderly persons is a difficult one, and the police certainly are to be commended, rather than censured, for every proper effort to uphold decency and order.

It is contended that this case is within the class of cases in which the evidence has been held sufficient to warrant conviction, known as the "trap cases," where a police trap is laid, into which the defendant falls. It is undoubtedly often necessary in detective or police work to lie in wait and place a snare in which to catch a criminal; but in all cases in which this has been justified there has been, in addition to the evidence of the conduct of the police officers, evidence also of an overt act on the part of the defendant showing his guilty participation in the commission of the crime. People v. Conrad, 182 N. Y. 529, 74 N. E. 1122, affirming without opinion 102 App. Div. 567, 92 N. Y. Supp. 606; People v. Mills, 178 N. Y. 274, 70 N. E. 786, 67 L. R. A. 131. Such evidence is entirely wanting in this case, unless the

defendant has been shown to have connived, encouraged, or knowingly permitted the acts of the detectives who came with the prostitutes, representing themselves to be man and wife. The only evidence of any improper occurrence is that of the police detectives concerning the acts encouraged and participated in by them. Proof of crime must frequently depend upon the testimony of officers of the law alone. Often none other is obtainable. But where the acts alleged to constitute the crime are committed by such officers with persons acting in concert with them, the evidence must be carefully examined to ascertain whether the defendant voluntarily and knowingly participated in the offense. As bearing upon this question, the position in which the defendant found himself at the time is important.

On the day before the period of observation began, the defendant received a telephone message, in response to which he called upon the police inspector of the district in which the premises were situated, and was told by the police inspector that prostitutes were soliciting men on the streets and taking them to his hotel. The defendant said that he would "attend to it," and asked the inspector for his advice. It also appears that, after this conference, the defendant sent his attorney to interview the inspector, and in addition wrote him a letter, requesting his assistance, as he believed he could be of material aid in keeping the neighborhood clean. The statement made by the police inspector to the defendant that prostitutes were coming to the hotel was not in itself evidence of knowledge of such fact on the part of the defendant. People v. Warden of the City Prison, 154 App. Div. 256, 138 N. Y. Supp. 1073. The notice given by the police is, however, of vital importance as bearing upon the defendant's conduct after the receipt of such notice.

In the case of People v. Wallach, 60 Hun, 584, 15 N. Y. Supp. 226,[1] the defendant was held guilty where it appeared that, after having been notified of the character of his tenants, he declared that he would rent his premises to prostitutes, or to any one—the evidence showing that the place was of the lowest character, that two successive tenants of the particular flat in question had been convicted, and that the second tenant had been permitted to remain in occupancy after conviction, the defendant personally collecting the rent. At 60 Hun, 584, 15 N. Y. Supp. 227, the court said:

"He must indeed have been blind if on these occasions he observed no evidences of prostitution," and concluded that "the conduct and the declarations of the defendant throughout were entirely inconsistent with innocence. They plainly indicated guilt, and defiant guilt at that."

The evidence in the case before me shows that the defendant had taken exceptional care in the selection of his employés, and, after his interview with the police inspector, he particularly instructed them that they should be careful as to whom they allowed to register, and that only respectable persons were to be admitted to the premises. At first the defendant directed that no guests should be received un-

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 60 Hun, 584.

less they had baggage. After a married couple had been turned away, and this had resulted in the defendant's being sued for damages, and upon the advice of his counsel, the defendant warned his clerks that they must be on their guard not to receive any person who aroused suspicion; that they must use their judgment with respect to acceptance of guests.

The registers that were put in evidence showed entries "D. N. S.," meaning "Did not stop," indicating a number of persons who had registered, but had been refused rooms. A permanent guest of the hotel testified that he had frequently seen people turned away by the clerk. The bell boys were instructed to report to the defendant personally if they noticed any guest acting in a disorderly manner, and a house detective was employed, who made rounds of the building every hour to see that the rules of the hotel were obeyed.

It also appears from the evidence that every guest was required to register, and that the defendant had a checking system which enabled him to keep account of all the rooms actually occupied, receiving a separate list from the housekeeper, which was daily compared by the defendant with the register. The rules of the house required callers to be received in the parlor on the main floor of the hotel. There was no evidence that any of the women mentioned by the police officers were known to the defendant or to any of the employés, or that they ever lived in the hotel, either as permanent or transient guests, to the knowledge of the defendant. And the defendant and his employés denied that they had ever admitted any persons to the premises known to them to be disorderly.

In support of the defendant's contention that disorderly persons were not permited to remain, he showed that during the past year some seven or eight persons had been asked to vacate their rooms upon the receipt of information concerning their conduct. It was after the defendant had been in conference with the police inspector of the district, and had warned his employés, that the detectives made their visits, accompanied by women, on the two nights in question to the hotel. The detectives testified that each of the women who solicited them immediately suggested that they should go to this hotel, and that, instead of waiting in the lobby or lady's waiting room, the women went with the detectives to register and stood near the desk, and that, while registering, the detectives testified they passed several remarks in the presence of the clerk; the evidence given by the detective being almost invariably that he intended to stay only a little while, and other remarks which were intended to convey to the clerk information concerning the purpose of the visit to the hotel. It was upon such evidence as this, which the court characterized as "inherently improbable," that the court reversed the judgment of conviction for a violation of section 322 of the Penal Code, charging the defendant with keeping a house of ill fame, in People v. Drum, 127 App. Div. 241, 110 N. Y. Supp. 1096.

A number of character witnesses, including the pastor of the church which the defendant attended, and other persons of undoubted probity,

were called and testified that the defendant had borne a good reputation. A number of permanent guests, whose characters were not questioned, and whose testimony was in no way shaken, testified that the hotel was quiet and orderly.

On the facts shown in this case, the court cannot sustain the judgment of conviction. The guilt of the defendant has not been established beyond a reasonable doubt. There is a total failure of either direct evidence of knowledge or of circumstances from which knowledge may be inferred that the premises were being used for disorderly purposes. The statute under which the defendant has been convicted defines a disorderly person as one who keeps the premises for a specific purpose, namely, for a resort for prostitutes. The evidence discloses that the defendant was bona fide conducting a hotel for permanent and transient guests; that, after being warned by the police that prostitutes were accompanying men to the premises, he took the natural and reasonable steps to prevent their visiting the premises, by seeking the co-operation of the police, requesting their assistance in preventing the presence of disorderly persons, by providing rules and giving instructions to the employés, pursuant to which persons who were suspected of being disorderly were actually turned away; and that the acts which took place, and upon which the information was lodged, were brought about without his knowledge or connivance by detectives who succeeded in escorting prostitutes to the premises. On this state of facts I cannot find that the defendant was the keeper of a house for the resort of prostitutes.

The judgment must be reversed.