**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**ALEIDA RODRIGUEZ, Appellant**

No. 18091

**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**JOSE MANUEL NIEVES, Appellant**

No. 18092

**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**ERNESTINA CORDERO, Appellant**

No. 18093

**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**ADELA GARCIA, Appellant**

No. 18094

**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**GLADYS RAMOS, Appellant**

No. 18095

**GOVERNMENT OF THE VIRGIN ISLANDS**

**v.**

**BECKY SALVAGE, Appellant**

No. 18096

United States Court of Appeals

Third Circuit

Argued September 19, 1969

Decided March 12, 1970

RONALD H. TONKIN, ESQ., Christiansted, St. Croix, Virgin Islands, *for appellants*

WILLIAM H. BROWN, ESQ., Assistant United States Attorney, Christiansted, St. Croix, Virgin Islands, *for appellee*

Before BIGGS, KALODNER and FREEDMAN, *Circuit Judges*

OPINION OF THE COURT

FREEDMAN, *Circuit Judge*

After a joint trial of these six defendants in the Municipal Court of the Virgin Islands, Jose Manuel Nieves was convicted and sentenced to imprisonment for 90 days for permitting a building in his control to be used for the pur-

pose of prostitution;[1] Gladys Ramos was convicted and sentenced to imprisonment for 30 days for soliciting for the purpose of prostitution;[2] and the other four defendants, Aleida Rodriguez, Ernestina Cordero, Adela Garcia and Becky Salvage, were each convicted and sentenced to imprisonment for 30 days under the vagrancy statute for residing and loitering in a house of ill fame.[3] They appealed to the District Court of the Virgin Islands, and from its judgments affirming their convictions (Government of Virgin Islands v. Rodriguez, 7 V.I. 360, 300 F.Supp. 860 (D.V.I. 1969)), they have taken these appeals, which we consolidated for argument.

I.

Defendants contend that we should modify the sentences imposed on them because they are excessive. For our power to do so they rely on Government of the Virgin

---

1 Title 14 of the V.I. Code provides:

"§ 1622. Prohibiting prostitution

"Whoever—

* * *

"(4) permits any place, structure, building or conveyance owned by him, or under his control, to be used for the purpose of prostitution, lewdness or assignation with knowledge or reasonable cause to know that the same is, or is to be, used for such purpose . . .

* * *

"shall be fined not more than $100 or imprisoned not more than 180 days, or both."

2 Title 14 of the V.I. Code provides:

"§ 1622. Prohibiting prostitution

"Whoever—

* * *

"(2) procures or solicits, or offers to procure or solicit, for the purpose of prostitution, lewdness or assignation . . .

* * *

"shall be fined not more than $100 or imprisoned not more than 180 days, or both."

3 At the time the informations were drawn, Title 14 of the V.I. Code provided:

"§ 2221. Miscellaneous acts of vagrancy

"Whoever—

* * *

"(8) lives in or loiters about houses of ill fame . . .

* * *

"shall be deemed a vagrant and shall be fined not more than $100 or imprisoned not more than 30 days, or both."

Islands v. Turner, 6 V.I. 659, 409 F.2d 102 (3 Cir. 1968). Turner was an exceptional case and Judge Aldrich's opinion, to which defendants refer, was withdrawn when the case was reheard en banc. In that opinion, moreover, it is acknowledged that "we have no power to review sentences." (6 V.I. at 664, 409 F.2d at 104.) The sentences here imposed were within the limits authorized by the relevant statutes; and aside from characterizing them as excessive, defendants have presented no reason which would justify a conclusion that the sentences were anything other than the result of a proper exercise of judicial judgment. There is, therefore, no justification for any modification of the sentences, even if it be assumed that we have power to intervene.

II.

Aside from the claim that the sentences were excessive, defendants mostly have repeated the arguments which the district court fully reviewed and disposed of in an opinion to which we cannot profitably add. There is, however, one important question which must be considered relating to the conviction of four of the defendants, Rodriguez, Cordero, Garcia and Salvage, for residing and loitering in a house of ill fame.

The information against these defendants charged them with residing and loitering in a house of ill fame "willfully and unlawfully," although the statute does not contain these words and makes no other express provision regarding knowledge. The question, therefore, is whether knowledge by the four defendants of the nature of the place as a house of ill fame is an essential element and was required to be proven. This is a question of first impression under

---

Subsection (8) has now been renumbered to become subsection (7) but without other change. Act of July 18, 1968, No. 2296, § 2, Sess.L. 1968, Pt. II, p. 247. We shall refer to it under its former designation, which the prosecution originally used and which has been consistently followed by the parties.

the Virgin Islands statute and since it is fundamental to the conviction of the four defendants, we must consider it in detail.

The problem which is raised goes to fundamental conceptions of criminal responsibility and reaches back to the origins of our criminal law. It early became established at common law that an essential ingredient of a crime was the existence of a guilty mind, a mens rea, as well as the act itself, actus rea.[5] Later, as the states codified the common law of crimes, the courts usually took the view that it would be presumed that intent or knowledge was an implied element of the statutory crime unless the legislature expressly indicated otherwise.[6] In the rhetorical language of Bishop, the great nineteenth century textwriter, speaking of the requirement of an evil intent as an inseparable element of every crime:

> "A statute is simply a fresh particle of legal matter dropped into the previously-existing ocean of law. It is subject to all the old attractions, and the old winds and lunar influences, precisely as were the several particles of the ocean before. Or, to speak without a metaphor, the new statutory rule is to be limited, extended, and governed by the same common-law principles, and to the same extent, as were the common-law rules themselves before the statute was passed."[7]

But even as the view requiring the existence of an evil intent or a mens rea hardened into accepted doctrine, a fresh factor introduced a new uncertainty. The government's increasing presence in a domain formerly considered private created a pressure for enforcement of administrative regulations by the use of criminal sanctions

---

[5] Haddad, The Mental Attitude Requirement in Criminal Law—And Some Exceptions, 59 J. Crim. L., Criminology & Police Science 4, 17 (1968); Hall, General Principles of Criminal Law 77–83 (2d ed. 1960); Sayre, Mens Rea, 45 Harv. L. Rev. 974 (1932); 2 Pollock & Maitland, The History of English Law, 476–78 (2d ed. 1898; 1968 paperback reprint); 1 Bishop, New Criminal Law § 287 (8th ed. 1892).

[6] See Morissette v. United States, 342 U.S. 246, 250–63 (1952); United States v. Balint, 258 U.S. 250, 251–52 (1922).

[7] 1 Bishop, New Criminal Law § 291b, p. 165 (8th ed. 1892).

regardless whether there was evidence that the offender, often a corporation, acted with guilty knowledge.[8] Enforcement in these circumstances was justified by the application of the doctrine of strict liability in what have been called "public welfare offenses."[9] This doctrine found intellectual justification in the well-known objective liability views of Holmes,[10] which ran against the prevailing tendency and asserted that the courts were not justified in implying scienter into a silent statute. Holmes, J., judicially expressed this view in Commonwealth v. Smith, 166 Mass. 370, 44 N.E. 503 (1896), where a defendant's conviction on a charge of being in a place unlawfully used as a common gaming house was sustained:

"It is unnecessary, under the statute, to allege the defendant's knowledge of the presence of the implements, or the character of the place. The statute means that people enter such places at their peril. It goes no further than other statutes which have been enforced by this court. When, according to common experience, a certain fact generally is accompanied by knowledge of the further elements necessary to complete what is the final object of the law to prevent, or even short of that, when it is very desirable that people should find out whether the further elements are there, actual knowledge being a matter difficult to prove, the law may stop at the preliminary fact, and, in the pursuit of its policy, may make the preliminary fact enough to constitute a crime.

* * *

"In like manner [as in criminal liability for the sale of intoxicating liquors regardless of knowledge whether the liquor is intoxicating, and the offense of adultery even in innocence that the other party is married, the law] may say that people are not likely to resort to a common gaming house without knowing it, and that they must take the risk of knowing the character of the place to which they resort, if the implements of gaming are actually present." (166 Mass. at 375–76, 44 N.E. at 504.)[11]

---

8 This development is traced in Morissette v. United States, 342 U.S. 246, 253–58 (1952).

9 Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55 (1933).

10 Holmes, The Common Law, 34 et seq. (Howe ed. 1963).

11 The discussion may be considered dictum, for a ticket showing that the

Holmes has been severely criticized for his seeming indifference to the moral aspect of conduct.[12] And while Holmes' view has found its application in the ordinary "public welfare offenses,"[13] even this limited acceptance of the doctrine of strict criminal liability has not been without criticism.[14] In the landmark case of Morissette v. United States, 342 U.S. 246 (1952), the Supreme Court refused to take the leap of applying to traditional crimes such as theft the rule of strict liability in social welfare offenses. Mr. Justice Jackson said:

> "The Government asks us by a feat of construction radically to change the weights and balances in the scales of justice. The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries. Such a manifest impairment of the immunities of the individual should not be extended to common-law crimes on judicial initiative." (p. 263)

The modern rule, therefore, may be summarized as stated in Delaney v. United States, 199 F.2d 107, 117 (1 Cir. 1952): The "trend in the interpretation of federal criminal statutes has been to discover by implication a re-

---

defendant had made a bet on a horse race was found on the defendant's person and this alone, of course, would have been sufficient to show his knowledge of the character of the place. Cf. Commonwealth v. Murphy, 342 Mass. 393, 173 N.E. 2d 630 (1961).

12 See H. L. A. Hart, Punishment and Responsibility, 242–45 (paperback ed. 1968). See also, infra, n. 14.

13 See United States v. Behrman, 258 U.S. 280 (1922); United States v. Balint, 258 U.S. 250 (1922). But see the restriction of the doctrine to public welfare offenses punishable by fines rather than by imprisonment in Commonwealth v. Koczwara, 397 Pa. 575, 155 A.2d 825 (1959); cf. Commonwealth v. Unkrich, 142 Pa. Super. 591, 16 A.2d 737 (1940).

14 E.g., H. L. A. Hart, Punishment and Responsibility 242–45 (paperback ed. 1968); Haddad, The Mental Attitude Requirement in Criminal Law—And Some Exceptions, 59 J. Crim. L., Criminology & Police Science 4 (1968); Hall, General Principles of Criminal Law 325–59 and passim; Packer, Mens Rea and the Supreme Court, 1962 Supreme Ct. Rev. 107, 152 and passim; Hart, Aims of the Criminal Law, 23 Law & Contemp. Probls. 401, 422–36 (1958).

quirement of scienter, where there is no reason to suppose that the Congress, by deliberate choice, omitted such a requirement."[15]

Guided by this principle, we turn to the Virgin Islands Code to determine whether it indicates a deliberate legislative choice that knowledge is not an essential element of the crime denounced by § 2221(8) of Title 14.

The legislative history of § 2221 is sparse. It shows only that subsection (8), along with three other subsections, came into the present Virgin Islands Code in 1957, derived from the Penal Code of California.[16] Subsection (8) is one of 19 categories of miscellaneous acts of vagrancy which deal with conduct in which intention or knowledge is for the most part inherent. While this was not the case with subsection (8) taken on its face, there is no indication that the legislature intended to dispense with the usual requirement of knowledge.[17]

Moreover, we find a significant indication of legislative intent in favor of knowledge expressed elsewhere in the Virgin Islands Code. 14 V.I. Code § 14 provides:

"All persons are capable of committing crimes or offenses except—

---

15 Similarly as to specific intent, see, e.g., Government of Virgin Islands v. Carmona, 7 V.I. 441, — F.2d — (3 Cir. January 22, 1970); Richardson v. United States, 403 F.2d 574 (D.C. Cir. 1968); Jackson v. United States, 348 F.2d 772 (D.C. Cir. 1965); United States v. Nedley, 255 F.2d 350 (3 Cir. 1958); Mullreed v. Bannan, 137 F.Supp. 533 (E.D. Mich. 1956).

16 Sections 647 and 647a. See Revision note, 3 V.I. Code Annot., p. 166. These sections, in turn, were part of a broader vagrancy law, which the California courts held was in part an attempt to codify the common law and which incorporated by implication common law doctrines, such as habitualness in certain forms of vagrancy. People v. Brandt, 306 P.2d 1069 (Cal. Super. Ct. 1956); People v. Craig, 152 Cal. 42, 91 P. 997 (1907) (dictum); People v. Denby, 108 Cal. 54, 40 P. 1051 (1895). The entire California vagrancy statute, including §§ 647 and 647a, was subsequently repealed after parts of it had been found unconstitutional. See In Re Newbern, 53 Cal.2d 786, 350 P.2d 116 (1960); Annotation, Validity of Vagrancy Statutes and Ordinances, 25 A.L.R.3d 792, 803 and passim (1969); and cf. Annotation, Validity of Loitering Statutes and Ordinances, 25 A.L.R.3d 836 (1969).

17 The requirement of knowledge has been applied in cases involving similar statutes. Bennett v. Commonwealth, 182 Va. 7, 28 S.E.2d 13 (1943); People v. Rankin, 92 Misc. 62, 155 N.Y.S. 86 (1915); People v. Meyer, 157

* * *

"(5) Persons who committed the act . . . under an ignorance or mistake of fact, which disproves any criminal intent."

While § 14 deals with capacity to commit crimes and is concerned with general defenses to a criminal charge, nevertheless it places on the prosecution when such a defense is raised the burden of proving the element of knowledge beyond a reasonable doubt.[18]

Section 14, therefore, is indicative of a legislative intention that § 2221(8) require knowledge that the house in which a defendant lives or at which he loiters is a house of ill fame. It is a legislative expression which adds affirmative support to the rule against reading a statute as abandoning a requirement of knowledge unless the statute exhibits such a deliberate legislative choice. It would be startling indeed if those who accept the advertised invitation of the Government of the Virgin Islands and come to it as a resort for relaxation and pleasure could be condemned as frequenters of houses of ill fame because they visit its inviting bars in complete innocence that an owner may be engaged in maintaining on the premises a place of prostitution.

We hold, therefore, that the burden was on the government to prove that the four defendants knew when they were present in the Nieves house that it was a house of ill fame. This in effect is the burden which the government itself undertook to carry when it alleged in the information that these defendants were there "willfully

---

N.Y.S. 997 (1914); People v. Drum, 127 App. Div. 241, 110 N.Y.S. 1096 (1908); People v. Miller, 81 App. Div. 225, 80 N.Y.S. 1070 (1903). There is also contrary authority: State v. McCormick, 142 La. 580, 77 So. 288 (1917) (habitual loitering).

18 Johnson v. United States, 291 F.2d 150, 155 (8 Cir. 1961); Government of Virgin Islands v. Smith, 4 V.I. 212, 278 F.2d 169, 173–74 (3 Cir. 1960). See also United States v. Byrd, 352 F.2d 570, 572–74 (2 Cir. 1965).

and unlawfully."[19] Since we have construed the statute to require guilty knowledge, which the government undertook to prove, the remaining question is whether the evidence was sufficient to support the charge against the four defendants.

III.

The evidence is unusually sketchy and unclear, probably in part at least because the trial before the Municipal Court judge without a jury followed immediately after he heard evidence on a motion to suppress evidence. The trial itself is, of course, independent from the motion to suppress, and counsel for the defendants emphasized at the outset of the trial that he would not agree that the testimony at the suppression hearing could be considered part of the testimony at the trial because he thought much of it was hearsay.

Despite its lack of fullness, the evidence was sufficient to reveal the following facts. Jaime Perez, a marshal in the Department of Public Safety, had been to the Nieves house about a month and a half earlier. At that time he saw a situation similar to that which he encountered on June 14, 1968. About the same number of people were present, although he could only identify one of the women present on June 14 as having been there on the earlier occasion.

On June 14, at about 10 o'clock in the evening, he went to the Nieves house. There were about 20 people present, eight or nine inside and 11 on what he called a "gallery." The parking area or front lawn "was full of cars." He went to the bar, apparently in the kitchen, which was tended by a young man and apparently the defendant Salvage. He bought two beers, received the change

---

19 Our construction of § 2221(8) makes it unnecessary to decide whether in any event the government would have been required to prove knowledge because of the language of the information.

from the young man and sat on the porch in front of the doorway to the livingroom. After a short time a young lady, later identified as defendant Ramos, approached him, opened a conversation and solicited him to have sexual intercourse with her. When he told her that the price she demanded was too high, she returned inside to the livingroom.

For about half an hour Perez observed men and women seated in the livingroom and what he called a "traffic" of ladies accompanied by males going back and forth into a room and then coming out again into the livingroom. He then gave an agreed signal and other officers who had been waiting outside joined him. One of these officers, Detective Torres, testified that when he arrived there were nine or ten men in the "gallery" and four ladies and five men inside the house, presumably in the livingroom. In the first room beyond the livingroom he found the defendant Garcia and a man in bed together. Both were nude.

The defendant Nieves was on the premises and so, of course, were Miss Ramos, who was charged with soliciting for the purpose of prostitution, and the other four defendants, who were charged with residing and loitering in a house of ill fame.

It is strenuously argued to us that while Miss Garcia may have been engaged in an act of sexual intercourse, this would not be enough to show that she knew the place was a house of ill fame. Similarly, that while Miss Salvage may have been present or might have assisted at the bar, this, too, is not enough to establish that she knew the place was a house of ill fame. If this is true, then it would be even clearer that there was no evidence to support the charges against the defendants Cordero and Rodriguez, who were merely found to be present on the premises.

No evidence specifically detailed what the defendants Rodriguez and Cordero were doing, except as they are included in the general description of the conduct of the females on the premises. The evidence, however, is enough to show that the defendants Cordero and Rodriguez were present in a small house where drinks were being sold and where a large number of men had congregated and were going in and out of a bedroom from time to time with women. It could readily be concluded from the general evidence of the officers that this coming and going was for the purpose of sexual intercourse and this is made even more clear by the defendant Ramos' solicitation of Perez and the defendant Garcia's presence in bed with a man.

It requires no excessive worldliness to conclude from this evidence that the four defendants were on the premises with full knowledge that it was a house of ill fame. It is true that much more evidence might have been produced and that even the evidence offered might have been more specific in the description of the conduct of the defendants Cordero, Rodriguez and Salvage. Indeed, the evidence as to all the defendants might have been more fully presented and more was obviously available, such as that of other police officers who were in the raid but did not testify and of the men who were gallantly allowed to leave. We cannot say, however, on a review of the evidence which was presented that the fact-finder was unjustified in concluding that the defendants knew the nature of the place in which they were present. We are not reviewing the evidence to determine whether it was sufficient to convict them of prostitution, but only whether a finding was permissible that they had knowledge that the place was a house of ill fame.

We hold, therefore, that there was adequate evidence to support the conviction of the defendants Rodriguez, Cordero, Garcia and Salvage under the vag-

rancy statute for residing and loitering in a house of ill fame. The evidence against the defendant Ramos fully justified her conviction for soliciting for the purpose of prostitution, and the evidence against the defendant Nieves fully supported his conviction for permitting a building in his control to be used for the purpose of prostitution.

The judgments of the district court will be affirmed.